***********
Upon review of the competent evidence of record with reference to the errors assigned, and finding no good grounds to receive further evidence or to rehear the parties or their representatives, the Full Commission upon review of the evidence reverses the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following which were entered into by the parties in a Pre-Trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Industrial Commission, and the Industrial Commission has jurisdiction over the parties and this claim. The parties are subject to and bound by the provisions of the North Carolina Workers' Compensation Act.
2. The employer-employee relationship existed between defendant-employer and plaintiff at all relevant times.
3. Defendant-employer was self-insured with Key Risk Management Services acting as the servicing agent.
4. Plaintiff's average weekly wage at the time of the injury was $253.12 per week, yielding a compensation rate of $168.76 per week.
 ***********
Based on the foregoing stipulations and the evidence presented, the Full Commission makes the following:
 FINDINGS OF FACT
1. At the time of the hearing before the deputy commissioner on 22 August 2002, plaintiff was 63 years old. She had completed the eighth grade, but obtained her GED at age 50. Plaintiff had worked for Mills Manufacturing for 25 years as an inspector, a job that involved inspecting parachute bags, using hand held snips to clip the loose threads on these bags. The snips were held only in her dominant right hand. Plaintiff spent 80 to 90% of her time each day clipping threads and inspecting.
2. A job video was introduced into evidence. Mr. Joel Guge, plaintiff's supervisor, testified that the job video was a fair and accurate depiction of the main component of plaintiff's job duties although she did perform other tasks during the average day. Plaintiff reviewed the job video and agreed that it was a fair and accurate depiction of her main job functions, although she believed that her actual production averaged 300 bags per day.
3. Mr. Guge estimated that approximately 80 parachute bags were produced per day with an estimated 1,000 snips per day. He explained that this was an average based on the number of bags that the company produces on a monthly basis. He noted that there might be some days where the production was as high as 200 bags per day, but that on average it was about 80 per day. Plaintiff's testimony concerning the number of parachute bags inspected per day is found to be credible. Plaintiff's pay was based on production and the expected production based on the job video narration was 34 bundles (10 bags per bundle) or 340 parachute bags per day. Plaintiff's pay records were consistent with her testimony on the number of parachute bags she inspected per day. No weight is given to Mr. Guge's estimate of the number of parachute bags plaintiff inspected per day or the number of clips or snips plaintiff performed per day.
4. Plaintiff has a history of hand problems dating back to 1992. She was diagnosed with a right thumb trigger finger condition in August 1992 for which she subsequently underwent surgery. Plaintiff also had pain and weakness in her left wrist and right middle finger in 1995, and she sought treatment for these symptoms on an intermittent basis until April 1997.
5. Plaintiff notified her employer in January 1999 of her intent to retire. The date identified for retirement was June 24, 1999. At the hearing, plaintiff testified that she retired because her hands were giving her problems; however, at the time she gave notice to the employer of her intention to retire, plaintiff had not seen any doctor for hand problems in nearly two years. Judy Page, human resources manager for Mills Manufacturing, testified that plaintiff advised her in January 1999 that she was going to retire because she wanted to spend more time with her grandchild and that plaintiff said she was looking forward to not working. Ms. Page testified that plaintiff did not tell her she was retiring because she could not work due to her hands. Also, both a COBRA form and a subsequent application completed by plaintiff reflect only that she was retiring and was not going on medical disability.
6. On or about May 12, 1999, plaintiff reported to her supervisor that her hand was hurting and that her symptoms had not subsided for a number of days. Two days later, she was seen by a Physician's Assistant at Weaverville Family Practice and was diagnosed with right ring finger problems. Plaintiff was taken out of work for one week.
7. Plaintiff was referred to Dr. James Thompson, an orthopaedic surgeon in Asheville, for ring finger and middle finger problems on her right hand. Plaintiff's initial visit with Dr. Thompson was on June 1, 1999, although plaintiff had previously treated with Dr. Thompson as early as 1992. Plaintiff complained of problems with the flexor tendons of her right ring finger. Dr. Thompson believed that plaintiff was developing flexor tenosynovitis of the right ring finger due to repetitive use of snips at work. Dr. Thompson placed plaintiff on light-duty restrictions including no use of snips through June 10, 1999. Plaintiff was thereafter given a light-duty release and told not to use snips from June 17, 1999 through June 24, 1999, the date plaintiff told Dr. Thompson that she intended to retire. By 17 June 1999, plaintiff was also complaining of tenderness and triggering of the right middle finger.
8. Mills Manufacturing accommodated plaintiff's restrictions by placing plaintiff in waxing, marking and cutting jobs that did not require the use of snips.
9. Plaintiff has not worked since she retired from Mills Manufacturing on June 24, 1999, and has not looked for work since her retirement. She testified that the pain in her hands, as well as the pain in her back and hips, which is not work-related, has kept her from working.
10. Plaintiff returned to Dr. Thompson on August 26, 1999, with complaints of tenderness in her right middle finger. Dr. Thompson wanted to re-evaluate plaintiff after she had been out of work for six months. Plaintiff was scheduled for a follow-up appointment on January 6, 2000. In the interim, on November 30, 1999, plaintiff filed a Form 18 notice of her claim for workers' compensation benefits.
11. At plaintiff's January 6, 2000 six-month evaluation with Dr. Thompson, he noted some snapping of the right middle finger and also found signs of median nerve compression of the right wrist with right hand numbness. Dr. Thompson had not documented any complaints of right hand numbness in his prior examination. Electrodiagnostic studies were ordered which indicated moderate right carpal tunnel syndrome and mild left carpal tunnel syndrome.
12. Plaintiff returned to Dr. Thompson on February 1, 2000, and he recommended surgery to decompress plaintiff's right median nerve and also recommended a release of plaintiff's right middle finger. Surgery was performed on March 13, 2000.
13. Plaintiff was seen on several occasions for post-operative care, and Dr. Thompson released her on August 31, 2000, after he noted she was "doing very well." Aside from one visit in October 2001, plaintiff has not returned to see Dr. Thompson.
14. Although Dr. Thompson understood plaintiff to be retired and did not assign work restrictions while she was under his care, in his deposition he clarified that plaintiff was capable of working through March 13, 2000, the date of her surgery, so long as she did not use snips. Furthermore, following surgery, Dr. Thompson would have had plaintiff out of work for a couple of days, then on a gradual progressive series of restrictions and would have released her without restriction by the middle of July 2000. Dr. Thompson testified that he did not actually release plaintiff to unrestricted duty until 31 August 2000. According to his testimony, Dr. Thompson's release to unrestricted duty was not the same as a release without restrictions and only meant that plaintiff should try to work. He did not know whether plaintiff could work.
15. Dr. Thompson opined that plaintiff's employment "accelerated, exacerbated and significantly contributed to" her tenosynovitis, carpal tunnel syndrome, and other hand problems for which he treated plaintiff. He further opined that plaintiff's employment put her at greater risk of contracting tenosynovitis and carpal tunnel syndrome than the general public.
16. Plaintiff scheduled an independent medical evaluation by Dr. Edward Brown Crosby on December 14, 2000. Plaintiff reported to Dr. Crosby that she was continuing to have pain in her hands and difficulty pushing, lifting, pulling and vacuuming. Her examination revealed tenderness in the carpal tunnel areas and tightness to motion in the small joints throughout her hands. Dr. Crosby opined that plaintiff's hand condition was "definitely" causally related to the job duties she performed while working for defendant-employer. He was of the opinion that plaintiff was at maximum medical improvement and he assigned permanent partial impairment ratings of 7.5% and 5% to plaintiff's right and left hands, respectively. Dr. Crosby agreed with Dr. Elliston's assessment that plaintiff was not totally disabled, but opined that plaintiff should avoid repetitive, stressful maneuvers with her hands such as piecework or assembly line work. He further opined that plaintiff is totally disabled from the type of work she has done in the past. Dr. Crosby further testified that if a "vocational person" found plaintiff to be totally disabled based on her medical condition and vocational background, he would agree with the assessment.
17. On or about August of 2001, Judy Page became aware that plaintiff was claiming to be entitled to workers' compensation benefits and that Dr. Thompson had indicated that plaintiff could return to unrestricted work. Plaintiff was offered a job as a zigzag inspector, effective August 20, 2001. After being offered the position, plaintiff went to Dr. Thompson and procured a note on August 23, 2001, indicating that she had permanent restrictions of no use of snips. However, on August 27, 2001, Dr. Thompson indicated after reviewing the zigzag inspector job description that he did not know whether the job would contribute to plaintiff's hand problems.
18. Dr. Crosby opined that the zigzag inspector job would cause plaintiff further hand problems. Plaintiff refused the position.
19. Plaintiff retained Randy Adams, a vocational rehabilitation counselor to perform a vocational evaluation. Mr. Adams was of the opinion that plaintiff did not have the residual functional capacity to perform competitive employment that would have been available to her considering her lack of transferable skills, low educational level and residual functioning in her upper extremities and that she was permanently and totally disabled from work. In formulating his opinion, Mr. Adams considered the physical restrictions assigned by plaintiff's doctors, including Dr. E. Bruce Elliston, plaintiff's family physician. Dr. Elliston restricted plaintiff to: (a) no lifting over five pounds; (b) no vibration tool use; and (c) frequent rest.
20. Ronald Alford, another vocational rehabilitation counselor, reviewed plaintiff's work history at the request of defendants. He performed a transferable skills analysis and obtained a labor market survey. Mr. Alford opined that jobs were available within the restriction of no use of snips and that plaintiff should be able to find such employment. Even taking into account plaintiff's additional restrictions for her non-work related conditions, Mr. Alford felt that a job search would not have been futile and that vocational rehabilitation would be of benefit. The Full Commission finds that, based upon the medical and other evidence of record, the opinion of Mr. Adams on plaintiff's employability is given greater weight than that of Mr. Alford.
21. Plaintiff's decision in January 1999 to take early retirement occurred before she resumed medical treatment for hand pain in May 1999. Plaintiff testified that she told her supervisor she was going to retire because her hands were bothering her. It is unclear from the evidence when this conversation took place. Plaintiff testified that she applied for social security disability because she was no longer able to work due to her back, hip and hand problems.
22. Based on plaintiff's testimony, she had been experiencing pain and problems with her hands over a long period of time, but on 12 May 1999, her problems became worse. Prior to May 1999, plaintiff had not sought medical treatment for her hands in more than two years. Therefore, plaintiff may have been having pain in her hands, but her pain was not disabling at the time she decided to retire.
23. At the time plaintiff left work due to retirement, she was capable of performing light duty work that did not involve use of snips. Defendant-employer had work available within these restrictions.
24. Both Dr. Thompson and Dr. Crosby were equivocal about plaintiff's ability to work after her hand surgery and medical release on August 31, 2000. They both believed she was not totally disabled from a medical perspective. The work restrictions of Drs. Elliston and Crosby are given more weight than those of Dr. Thompson.
25. As a result of her compensable occupational disease, plaintiff was temporarily totally disabled from May 14, 1999 to May 24, 1999 and from March 13, 2000 after her surgery through August 31, 2000, the date she reached maximum medical improvement and was released by her doctor.
26. Considering plaintiff's medical restrictions caused by her compensable occupational disease, her other unrelated medical conditions, her vocational limitations and age, plaintiff was incapable of working in any employment after she reached maximum medical improvement on August 31, 2000 and therefore remained totally disabled.
27. Plaintiff is entitled to receive total disability compensation in the amount of $168.76 per week from May 14, 1999 to May 24, 1999 and from March 13, 2000 and continuing until further order of the Commission.
28. Plaintiff needs further medical treatment for her work related occupational disease affecting her hands.
 ***********
The foregoing Findings of Facts engender the following:
 CONCLUSIONS OF LAW
1. Plaintiff has proven that her bilateral carpal tunnel syndrome, tenosynovitis and related hand conditions are compensable occupational diseases. Plaintiff's employment significantly contributed to the development of her carpal tunnel syndrome, tenosynovitis and other noted hand problems. Her employment placed her at an increased risk over the general public of contracting these conditions. N.C. Gen. Stat. § 97-53(13).
2. As a result of her occupational disease, plaintiff was unable to work from May 14, 1999 to May 24, 1999 and from March 13, 2000 through the date of hearing before the deputy commissioner and continuing. She is entitled to receive total disability compensation in the amount of $168.76 per week from May 14, 1999 to May 24, 1999 and from March 13, 2000 through the date of hearing before the deputy commissioner and continuing until further order of the Commission. N.C. Gen. Stat. § 97-29.
3. Plaintiff is entitled to payment of medical expenses for the treatment of her compensable occupational disease for so long as treatment is reasonably required to effect a cure, give relief, and/or lessen plaintiff's disability.
 ***********
The foregoing Findings of Facts and Conclusions of Law engender the following:
 AWARD
1. Defendants shall pay to plaintiff compensation for total disability at the rate of $168.76 per week from May 14, 1999 to May 24, 1999 and from March 13, 2000 through the date of hearing before the deputy commissioner and continuing until further order of the Commission.
2. A reasonable attorney fee in the amount of 25% of the compensation awarded to plaintiff is approved and allowed for plaintiff's counsel. An attorney fee shall be deducted from the accrued compensation due plaintiff and paid directly to plaintiff's attorney; thereafter, every fourth check shall be deducted from the compensation due plaintiff and paid directly to plaintiff's counsel.
3. Defendant-employer shall pay for all of plaintiff's medical expenses incurred or to be incurred in the future which are related to her compensable injury when bills have been submitted according to Commission procedure.
4. Defendant-employer shall pay the costs of this action.
This the ___ day of July 2004.
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
CONCURRING:
 S/_____________ THOMAS J. BOLCH COMMISSIONER
 S/_______________ CHRISTOPHER SCOTT COMMISSIONER